**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARYAM TAHMASEBI,
South Texas Family Residential Center,
300 El Rancho Way, Dilley, TX 78017;

SEYED EISSA HASHEMI,
South Texas ICE Processing Center,
566 Veterans Drive, Pearsall, TX 78061; and

S.M.H., a minor, by and through his parents and next friends,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. DEPARTMENT OF STATE; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State; and DAVID VENTURELLA, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants.*

Civil Action No. 1:26-cv-3975

Related Case (LCvR 40.5):

*IALDF v. Rubio,*
No. 1:26-cv-02375-ACR

**COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT,**
**<u>AND INJUNCTIVE RELIEF</u>**

**PRELIMINARY STATEMENT**

1. This is a case about the government's information practices and its truthfulness, brought by the three people those practices have put in danger. Plaintiffs are a family of lawful permanent residents - a psychology professor, her husband, and their seventeen-year-old son. No charging document in any proceeding alleges that any of them did, said, or believed

anything. The sole stated predicate for what has been done to them is who their relatives are.

2. Since at least June 2025, Defendants have operated a coordinated program to deliver the identities, locations, and identity documents of Iranian nationals detained in the United States to representatives of the Islamic Republic of Iran - the government those detainees fear. Defendants' own emails, produced under the Freedom of Information Act, document the channel: deportation manifests with passport and travel-document scans attached, transmitted through the State of Qatar "to coordinate the final approval with the Iranian Embassy"; Tehran requesting that ICE "amend the previous manifest and expedite the removal process"; Tehran issuing documents for three named detainees and "request[ing] they be added to the flight." The Islamic Republic of Iran does not merely receive American removal flights. It edits the passenger lists.

3. Plaintiffs sit inside that machine. They are detained by the agencies that run it, in a region those agencies' own statistics identify as a principal hub of the program, while the Secretary of State's stated determination against them - announced to the world on his social-media account, over a photograph of Plaintiff Hashemi, with the declaration that "America can never become home for anti-American terrorists or their families" - marks them for removal to Iran. Ms. Tahmasebi asked the government a simple question, in writing, by subpoena application, and on the record in open court: has her information been shared with the government of Iran, and will it be? The government refused to answer every time. Its counsel's only statement on the record was: "I don't know if any communication was communicated to anyone." Federal law requires it to know, and to tell her. 5 U.S.C. § 552a(c).

4. The government's stated reason for all of this is that Plaintiffs' presence in the United States harms American foreign policy. Its conduct proves the stated reason is not the genuine one. Plaintiffs have been trying to leave the United States, together, promptly, at their own expense, since June 2026. The government has blocked every exit. It rejected a voluntary-departure proposal in writing and counter-offered "a stipulated order of removal, with continued detention." When an Immigration Judge granted Mr. Hashemi voluntary departure, the government appealed - committing its lawyers to keep in the country the man it certified as harmful to keep. And in September 2026, while Ms. Tahmasebi sat in Dilley charged as a danger to American foreign policy, another component of Defendant DHS renewed her permanent resident card and mailed it to her - the same card the government had publicly announced "revoked" in April. An agency may make hard choices. It may not announce one justification and pursue its opposite. "Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Commerce v. New York*, 588 U.S. 752 (2019).

5. This action does not challenge Plaintiffs' removal proceedings, any custody determination, or the execution of any removal order, and it seeks no relief respecting custody. It seeks what the Privacy Act, the Administrative Procedure Act, and the Constitution command and the government refuses: an accounting of what has been disclosed about this family; an end to such disclosures; damages for those already willfully made; and vacatur of a disclosure program that no statute authorizes and no honest rationale supports.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 552a(g)(1). The Privacy Act expressly places venue in the District of Columbia. 5 U.S.C. § 552a(g)(5). Venue is

also proper under 28 U.S.C. § 1391(e)(1): Defendants are agencies and officers of the United States resident in this district, and a substantial part of the events giving rise to the claims - including the transmission decisions of Defendants' Washington headquarters, deliveries to the Iranian Interests Section in Washington, and the Secretary of State's determination - occurred here.

7. No jurisdiction-channeling provision of the Immigration and Nationality Act reaches these claims. Plaintiffs do not ask this Court to review any order of removal, any decision to commence proceedings or seek removal, or any part of the process by which their removability will be determined. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020); *Jennings v. Rodriguez*, 583 U.S. 281 (2018). Section 1252(g) is limited to three discrete actions - commencing proceedings, adjudicating cases, and executing removal orders - and the disclosure of Plaintiffs' records to a foreign government is none of them. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). A challenge to an extra-statutory disclosure program arises from the program's adoption, not from any "action taken . . . to remove an alien," and belongs in district court. *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019).

8. Nor could these claims be heard anywhere else. In the related case in this district, the government told this Court that a noncitizen fearing these very disclosures "could assert such claim during the removal proceedings." *Iranian Am. Legal Def. Fund v. Rubio*, No. 1:26-cv-02375-ACR, ECF No. 23 at 23. Ms. Tahmasebi did exactly that. The government then opposed her subpoena, refused three times to state on the record whether her information had been shared, and left the question unanswered; the Immigration Judge stated on the record that her review is confined to the record of proceedings and does not

extend to outside policy directives. The forum the government designated has thus disclaimed, from the bench, any power to examine the program challenged here - which is why these claims are precisely the kind that would be "effectively unreviewable" through a petition for review. *Jennings*, 583 U.S. 281. Plaintiffs now accept the government's forum concession in the only court where the question can be compelled.

9. This case is related to *Iranian American Legal Defense Fund v. Rubio*, No. 1:26-cv-02375-ACR (D.D.C.), within the meaning of Local Civil Rule 40.5(a)(3): both cases involve common issues of fact concerning the same program, the same agencies, and the same document trail.

10. The current posture of the related case confirms that this action is the surviving vehicle - and the structurally correct one. On October 15, 2026, after an evidentiary hearing, the court in *IALDF* denied the organization's motion for preliminary relief, stating that it had no basis to find a likelihood of success and crediting the testimony of two agency witnesses that no removal-coordination policy existed. Oct. 15, 2026 Hr'g Tr. 67 (quoted in *IALDF*, ECF No. 51 at 3). Defendants have now moved to dissolve the protective order entered that same day, arguing that the organizational plaintiff lacks standing because no "policy" was proven. *IALDF*, ECF No. 51 (Nov. 4, 2026). Whatever the force of that argument against an organization, it has none here. The Privacy Act does not condition its protections on the existence of a policy: its prohibitions and duties attach to each disclosure of each individual's records, 5 U.S.C. § 552a(b), (c), and Plaintiffs sue over their own. Each Plaintiff remains a lawful permanent resident, because none is subject to an administratively final order of removal, 8 C.F.R. §§ 1.2, 1241.1, and each is therefore an "individual" entitled to invoke the Act. 5 U.S.C. § 552a(a)(2). Plaintiffs' claims rise or fall

on what Defendants did with Plaintiffs' records - a question no finding about the existence of a generalized policy can answer, and one the related litigation has never been permitted to reach.

11. Plaintiffs do not concede the accuracy, lawfulness, or good faith of the Secretary of State's determination, which they are contesting in their removal proceedings. They plead its existence, its terms, and the irreconcilable conflict between its stated rationale and Defendants' conduct.

**PARTIES**

12. Plaintiff Maryam Tahmasebi is a citizen of Iran and a lawful permanent resident of the United States, admitted June 28, 2016 as a diversity-visa immigrant. She is a psychology professor. She is an "individual" within the meaning of 5 U.S.C. § 552a(a)(2). She has been detained since on or about April 9, 2026 at the South Texas Family Residential Center in Dilley, Texas, with her son, Plaintiff S.M.H. On September 15, 2026, an Immigration Judge ordered her removed while finding her testimony credible; her timely appeal to the Board of Immigration Appeals renders that order not administratively final. 8 C.F.R. § 1241.1.

13. Plaintiff Seyed Eissa Hashemi is a citizen of Iran, a lawful permanent resident admitted June 28, 2016, and an "individual" under 5 U.S.C. § 552a(a)(2). He is detained at the South Texas ICE Processing Center in Pearsall, Texas. On July 16, 2026, an Immigration Judge granted him voluntary departure, with departure to be effected by November 13, 2026. On August 14, 2026, the Department of Homeland Security appealed that grant to the Board of Immigration Appeals, where it remains pending. He remains detained, subject to no administratively final order.

14. Plaintiff S.M.H. is the seventeen-year-old son of Plaintiffs Tahmasebi and Hashemi - sixteen when he was arrested - a citizen of Iran, a lawful permanent resident, and an "individual" under 5 U.S.C. § 552a(a)(2). He appears by and through his parents as next friends. Fed. R. Civ. P. 5.2(a)(3), 17(c). He is detained with his mother at Dilley, where he marked his seventeenth birthday in September 2026.

15. Defendant U.S. Department of Homeland Security is an executive department and an "agency" within the meaning of 5 U.S.C. §§ 551(1) and 552a(a)(1). Defendant **U.S.** Immigration and Customs Enforcement is a component of DHS and maintains systems of records concerning Plaintiffs, including their Alien Files and enforcement and removal records. Defendant U.S. Department of State is an executive department and agency. Defendants Markwayne Mullin, Secretary of Homeland Security, Marco Rubio, Secretary of State, and David Venturella, Acting Director of ICE, are sued in their official capacities for the equitable and constitutional claims. The Privacy Act claims (Counts I and II) run against the agency Defendants only. 5 U.S.C. § 552a(g)(1).

## LEGAL FRAMEWORK

### A. Congress Decided This Exact Question in 1974

16. The Privacy Act's rule is one sentence: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless a listed exception applies. 5 U.S.C. § 552a(b). Because Plaintiffs are lawful permanent residents, they are "individuals" the Act protects. Id. § 552a(a)(2). The law-enforcement exception reaches only instrumentalities "within or under the control of the United States," id. § 552a(b)(7) - a description that does

not fit the Islamic Republic of Iran. A "routine use" must be "compatible with the purpose for which [the record] was collected," id. § 552a(a)(7), and an agency "may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act." *Doe v. Stephens*, 851 F.2d 1457, 1465-66 (D.C. Cir. 1988).

17. The Act enforces itself in three ways that matter here. First, every agency must keep "an accurate accounting" of the date, nature, and purpose of each disclosure and the recipient's name and address, retain it for at least five years, and make it "available to the individual named in the record at his request." 5 U.S.C. § 552a(c)(1)-(3). No agency may exempt any system of records from the duty to keep that accounting. Id. § 552a(j), (k). Second, every agency must "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records" - a duty Congress likewise placed beyond the reach of any exemption. Id. § 552a(e)(10), (j), (k). Third, the Act makes the United States liable for actual damages, with a $1,000 statutory floor, plus costs and fees, where an agency's violation was "intentional or willful" and had an adverse effect on the individual. Id. § 552a(g)(1)(D), (g)(4); *Doe v. Chao*, 540 U.S. 614 (2004); *FAA v. Cooper*, 566 U.S. 284 (2012).

**B. The Government's Own Regulations Forbid These Disclosures**

18. By regulation, information "contained in or pertaining to" an application for asylum or related protection "shall not be disclosed without the written consent of the applicant," subject to narrow exceptions inapplicable here. 8 C.F.R. §§ 208.6, 1208.6. And when notifying consular or diplomatic officials about a detained noncitizen, officers "shall not reveal" the fact that the noncitizen has applied for asylum or withholding. 8 C.F.R. § 236.1(e). The courts of appeals have recognized that the government's breach of these

confidentiality protections can itself endanger the applicant and give rise to new protection claims. *Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008); *Zhen Nan Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 267-68 (2d Cir. 2006); *Dayo v. Holder*, 687 F.3d 653, 657 (5th Cir. 2012). The disclosure is the injury. It cannot be recalled.

**C. Review Is Independent, and Explanations Must Be Genuine**

19. Under the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). The court decides the statutory-authority question for itself; agencies receive no deference on the scope of their own power. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). And the explanation offered must be the real one: "The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions," and courts "are not required to exhibit a naivete from which ordinary citizens are free." *Dep't of Commerce*, 588 U.S. 752. Where the rationale is contrived, the action falls - and on a strong showing of bad faith, inquiry into the decisionmakers' processes, including extra-record discovery, is warranted. Id.; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).

## STATEMENT OF FACTS

**A. A Family Punished for Its Relatives**

20. Plaintiffs immigrated lawfully in 2016 through the diversity-visa program and built a decade of life in the United States. Ms. Tahmasebi taught psychology at a California

college. No Plaintiff has ever been charged with a crime in any country. In ten years, no agency of the United States ever alleged that any of them did anything.

21. On April 9, 2026, the Secretary of State allegedly “determined,” under 8 U.S.C. § 1227(a)(4)(C), that Plaintiffs’ presence in the United States would have “potentially serious adverse foreign policy consequences.” Within days, ICE arrested all three - the professor, her husband, and their child - and DHS placed them in removal proceedings on that sole charge. The charging documents allege family relationships. *Nothing else*.

22. The Secretary then announced the family’s case on his personal social-media account, over a photograph of Mr. Hashemi: “America can never become home for anti-American terrorists or their families - and under the Trump Administration, it never will.” The post, which was admitted into the record of Ms. Tahmasebi’s removal proceedings, supplies the government’s theory in the Secretary’s own words: “or their families.” Punishment of kin, as kin. Accompanying government statements publicly named all three Plaintiffs - including a then-sixteen-year-old child - and broadcast their immigration status to the world.

**B. The Family Tried to Leave. The Government Locked the Door.**

23. If the harm is Plaintiffs’ presence, the cure is their departure - immediate, self-funded, permanent. Plaintiffs hold valid Iranian passports, in the custody of undersigned counsel, that do not expire until 2031. They have asked to use them since June 2026.

24. The government said no, in every available form. It opposed voluntary departure in litigation. It rejected a written proposal for prompt, self-funded departure and counter-offered “a stipulated order of removal, with continued detention.” When Mr. Hashemi nonetheless won a grant of voluntary departure on July 16, 2026, DHS appealed - filing a

notice of appeal on August 14, 2026, and committing government counsel to litigate against the departure of a man whose departure is the only relief the Secretary's stated determination logically demands. The United States is simultaneously certifying that Mr. Hashemi's presence damages its foreign policy and appealing the order that would end his presence. Both positions cannot be genuine.

25. The family has now been detained for seven months: a mother and her teenage son at Dilley, the father at Pearsall. On September 15, 2026, the Immigration Judge ordered Ms. Tahmasebi and S.M.H. removed - while finding Ms. Tahmasebi credible - and their timely appeal keeps that order from becoming final. Detention continues under 8 U.S.C. § 1226.

26. Detention in this posture serves no purpose the law recognizes. Civil immigration detention is constitutional only as "part of the means necessary to give effect to" exclusion or expulsion. *Wong Wing v. United States*, 163 U.S. 228 (1896). Here it gives effect to nothing: Plaintiffs seek to depart, and Defendants obstruct the departure. When a restriction "is not reasonably related to a legitimate goal - if it is arbitrary or purposeless - a court permissibly may infer that the purpose of the governmental action is punishment." *Bell v. Wolfish*, 441 U.S. 520 (1979). No inference is needed here. The government's expressed position, in writing, was removal "with continued detention" - custody as a demand, not an incident of process. On information and belief, Defendants maintain a policy[1], pattern, practice, or shared understanding - written or unwritten, formal or informal - of detaining individuals designated under 8 U.S.C. § 1227(a)(4)(C), and similarly situated Iranian

[1] Counsel is aware that this Court was not able to find the existence of a "policy" of sharing information of Iranian nationals. This administration is not known for its transparency, nor for being forthright. The lack of a discrete policy of sharing Iranian nationals' information does not mean there are not orders – oral or written – to share *any* information for *any* foreign national if it helps further the administration's aggressive deportation agenda. An agenda that, apparently, even President Trump thinks may have "gone too far."

nationals, in order to punish, coerce, and deter - not to effectuate removals that Defendants' own conduct obstructs.

27. Plaintiffs plead these facts as evidence of Defendants' punitive purpose. They seek no relief respecting custody, which is the subject of a pending habeas corpus petition in the United States District Court for the Western District of Texas. *Hashemi v. Mullin*, No. 5:26-cv-03066-XR.

**C. The Program: Tehran Approves the Manifests**

28. On June 19, 2025 - during open hostilities between Israel, the United States, and Iran - the Acting Executive Associate Director of ICE's removal directorate instructed staff: "Please begin working on a plan to remove all removable FO Iranians in custody . . . . We need a plan forward ASAP." ICE's Acting Director responded the same morning: "Yes. Launch target cases as a priority." (FOIA release 2026-ICLI-00013 ("FOIA Rel.") at 0384.) The directive was nationality-based. The accompanying census counted 5,875 Iranian cases and 522 detainees; criminality appears nowhere in it. (Id. at 0384-85.) The same thread records that Iran's airspace was closed and that neighboring countries were opening their borders "to allow those fleeing Iran to get out." (Id. at 0383.) The agency documented the refugee outflow and planned removals into it. Excerpts of the production, with the passages quoted in this Part highlighted, are attached as Exhibit A and incorporated herein. Fed. R. Civ. P. 10(c).

29. Removal to Iran runs through disclosure. ICE's own emails state that Iran "has not issued a TD[2] this year" and that "State has never assisted with Iran with any cases." (FOIA Rel. at 0497-98.) So the program built a channel: an ICE attaché transmits the removal manifest, with "the PP/TD scans for all aliens on the manifest," to Qatari authorities, who "coordinate

[2] Travel document.

the final approval with the Iranian Embassy." (Id. at 0502.) The channel gives Tehran editorial control. "Iran has requested that I amend the previous manifest and expedite the removal process." (Id. at 0256.) "The Iran Embassy just issued passports or travel documents for the three listed below. They requested they be added to the flight." (Id. at 0496.) On one flight, fifty-four Iranian nationals were removed under a manifest shared with a foreign charter carrier. (Id. at 0389.)

30. The program predates and extends beyond the FOIA production. As alleged in the related case in this district on the basis of detainee and source accounts, the arrangement began with a March 2025 meeting at which a United States official handed the Iranian Interests Section a list of approximately 150 detained Iranians; continued through monthly meetings at which ICE shared immigration files including asylum materials; included files mailed and hand-delivered to the Interests Section; and extended to Interests Section officials receiving in-person access to Iranian detainees inside ICE detention facilities, where detainees report the officials already knew the contents of their protection claims. IALDF v. Rubio, No. 1:26-cv-02375-ACR, ECF No. 1 ¶¶ 22-35. Sworn declarations in related litigation likewise attest that rosters and dossiers of Iranian detainees were hand-delivered to Iran's Interests Section in Washington beginning in March 2026.

31. The program treats federal litigation as a reason to accelerate. An ICE Office of the Principal Legal Advisor attorney, National Security Law Division, wrote of one detainee: "Given the federal habeas petition, we appreciate your quick assistance on this case!" (FOIA Rel. at 0500.)

32. The channel also operates without regard to whether the individual may lawfully be removed at all. ICE's own June 2025 census distinguished the two populations - of 522

detained Iranians, 244 had final orders and 278 were "in proceedings" (FOIA Rel. at 0385) - and then built a single pipeline for both: the plan to remove "all removable FO Iranians in custody" (id. at 0384) grew into sweep requests in ICE's family-unit removal channels for "any Iranians in your docked [sic]" (id. at 0436), manifests whose passport and travel-document scans were provided wholesale to Qatari intermediaries for the Iranian Embassy's "final approval" (id. at 0502), and Iranian requests that named detainees "be added to the flight" (id. at 0496). Procedural posture was no obstacle but an accelerant: beyond the habeas email above, OPLA wrote that it "would like to ensure that we are continuing to move this case forward in light of ongoing litigation" (id. at 0498); six Iranians who had been granted withholding of removal were removed to the Central African Republic while their motions to reopen were pending (IALDF, ECF No. 36); and B.W., an asylum applicant subject to no final order, was made to meet Iranian Interests Section officials who already possessed the confidential details of his claim (IALDF, ECF No. 43). A disclosure channel that treats the protected, the pending, and the removable identically is not "coordinating and conducting the removal" of anyone "under the Immigration and Nationality Act" - and as to individuals with no removal to coordinate, it is not colorably within any published routine use at all. Plaintiffs are such individuals.

33. Nor does winning protection end the danger. As reported in the related case, in August 2026 the United States removed to the Central African Republic six Iranian nationals who had been granted withholding of removal protecting them from removal to Iran, while their motions to reopen were pending. *IALDF v. Rubio*, ECF No. 36. The disclosure of a protection-seeker's identity thus follows the person wherever the government sends him -

which is why the only protection that travels with Plaintiffs is the confidentiality the law already guarantees them.

34. Events of the past three weeks confirm both the mechanism and the urgency. On October 15, 2026, the court in the related case ordered the government to provide five business days' written advance notice before "removing any Iranian individual present in the United States to Iran or to a third country where Iran, or any official acting on behalf of Iran, will later coordinate the individual's travel to Iran," directing that the order "be read broadly to include any removal of Iranians that could result in those individuals being sent to Iran," and to notify the court within twenty-four hours of the finalization of any such plan. *IALDF*, ECF No. 45 (unsealed Nov. 5, 2026). The court warned on the record: "If anything happens that violates either of those two orders, I will hold every single person associated with violating it -- I will start contempt proceedings." Oct. 15, 2026 Hr'g Tr. 14 (quoted in *IALDF*, ECF No. 51 at 1). On November 4, 2026, Defendants moved to dissolve the order. *IALDF*, ECF No. 51.

35. Four days later, the organization notified the court, on sworn declarations, of an apparent violation: at approximately 4:00 a.m. on November 8, 2026, eleven Iranian nationals - ten men and one woman - were removed on a flight staged from Mesa, Arizona, routed through the country of Georgia to Islamabad, Pakistan, on fifteen-day Pakistani visas, with onward transfer to Iran scheduled for November 10. The schedule had been announced to detainees in person, at a detention facility in Arizona, by an official of the Iranian government - who, on request, displayed the flight list bearing one detainee's name and the names of ten other Iranian nationals. And in a parallel matter, an Assistant United States Attorney explained to counsel, citing a deportation officer, that the removal "would occur in two stages - first a

flight to Pakistan, followed by a second flight to Iran." *IALDF*, ECF No. 55 ¶¶ 1-5 & Exs. 1-2 (Nov. 8, 2026). A manifest of detained Iranians in the hands of an Iranian official is the program reduced to a single image: Defendants' records, delivered to the government Plaintiffs fear, determining who boards. Plaintiffs are subject to no administratively final order. What stands between them and such a manifest is the pendency of their proceedings - and the relief sought here.

36. Plaintiffs' claims do not depend on whether any of this is called a "policy." Whether the arrangement described above is a policy, a pattern, a practice, an understanding, a directive, a priority, or an expectation; whether it was adopted in a memorandum or arrived at in a meeting; whether it was transmitted in writing, by email, by text message, orally, or by implication; and whether compliance is secured by order, by suggestion, or by consequence - the Privacy Act asks a narrower question: did an officer or employee of an agency disclose a record pertaining to an individual without that individual's written consent, and does the agency maintain an accounting of the disclosure. 5 U.S.C. § 552a(b), (c). Each disclosure is a discrete violation, however its authors characterize the arrangement that produced it. Testimony that no "policy" exists therefore answers no question presented here, where the government's own FOIA production documents the disclosures themselves: the emails, the lists, the manifests, the meetings. If Defendants maintain (as expected) that there was no policy, then each disclosure for the Plaintiffs here was an individual choice - unauthorized by any published routine use, and squarely the Act's concern. And *these* Plaintiffs unquestionably have standing.

37. No statute authorizes any of this. The Privacy Act's rule is consent: an agency may not disclose an individual's record to anyone — another agency, let alone a foreign government

— without the individual's written consent, unless a published exception applies. 5 U.S.C. § 552a(b). That prohibition does not ask whether the individual has been granted protection from the receiving country; it attaches to the record itself. The asylum-confidentiality regulations operate the same way: they protect information "contained in or pertaining to" an application for asylum or related protection from the moment the application is filed, and that protection does not expire upon denial or await a grant. 8 C.F.R. §§ 208.6, 1208.6.

38. Ms. Tahmasebi's and S.M.H.'s protection claims remain pending on appeal; the confidentiality of those applications is not contingent and is not waived. Nor would an adjudicated fear change the analysis Congress wrote: no statute authorizes ceding control of American removal manifests to a foreign power, and nothing in the Immigration and Nationality Act makes the receiving state a participant in selecting who is removed.

39. And if Defendants' answer is that no tribunal has yet adjudicated what Plaintiffs have to fear from Iran, the answer indicts them: Defendants opposed the subpoena that would have tested the question, refused three times to answer it on the record, and appealed the only relief any Plaintiff has won. Having obstructed every path to an adjudication, Defendants cannot invoke its absence as authority. The program is an extra-statutory invention: adopted by agreement and directive, implemented by email. email.

**D. Plaintiffs Asked the Question. The Government Refused to Answer It.**

40. Ms. Tahmasebi's asylum case turned on the danger created by disclosure to Iran. So she asked. By written request, by subpoena application dated August 6, 2026, and on the record in open court on August 12, 2026, where undesigned counsel asked government counsel Mr. Celestin Nkeng[3] to certify that her information had not been and would not be shared

[3] In immigration court, Mr. Nkeng introduces himself as a "special national security" counsel for the Office of the Principal Legal Advisor. Counsel is unsure what this means, but it is a statement that Mr. Nkeng has some sort of enhanced position with regard to representations made about national security. This makes his supposed lack of knowledge about information sharing with a hostile government curious at best.

with Iran. The government refused three times. Its counsel's complete answer: "I don't know if any communication was communicated to anyone." The tribunal stated it could not compel an answer. Ms. Tahmasebi then declined, on the record, to testify to the substance of her claims, because she could not trust that her testimony would not reach the government she fears. The Immigration Judge - who found her credible – had (in response to being questioned by undersigned counsel) previously stated that her review is confined to the record of proceedings, not to outside policy directives.

41. Congress anticipated the agnostic agency. The accounting duty of § 552a(c) exists so that "I don't know" is never a lawful answer to the question whether an agency gave a person's records to the government she fled. The agency is required to know. It must have known for every disclosure since the program began. And on request, it must tell the individual. On November 9, 2026, immediately before this filing, each Plaintiff served requests for the accounting of disclosures and for access to records, under 5 U.S.C. § 552a(c)(3) and (d)(1), on ICE, DHS, and the Department of State.

42. The government's public posture completes the picture. To the press, DHS declared allegations of sharing asylum records with Iran "FALSE." In this Court, in the related case, it said such claims belong in removal proceedings. In the removal proceedings, it refused to answer them and opposed the subpoena that would have - while the Immigration Judge confirmed she reviews only the record before her, not the policy directives that produced it. Three forums, three postures, one constant: no answer, and no forum permitted to compel one. Until this one.

43. The related case also shows how disputes of this kind are resolved in this District: live and in person. On October 15, 2026, the court in *IALDF* convened an evidentiary hearing, heard

two government witnesses, and decided the organization's motion for preliminary relief on express credibility findings - crediting testimony that no removal-coordination policy exists. Twenty-four days later, eleven Iranian nationals were staged out of Arizona at 4:00 a.m. on a Sunday, bound for Iran through Islamabad, on a schedule announced to detainees in person by an Iranian official holding the flight list - and when counsel in that case wrote to government counsel the night before, asking for confirmation that no Iranian national would be removed before the court-ordered notice period had run, no answer came. *IALDF*, ECF No. 55 ¶¶ 1-9.

44. Whether those events can be reconciled with the testimony credited at the hearing is not a question this complaint asks the Court to answer. But the sequence teaches two things about this controversy.

45. First, paper assurances about this program - press statements, briefs, declarations - have repeatedly failed to survive contact with events; what the government says and what happens at 4:00 a.m. on a Sunday are different things, and only testimony tested by cross-examination can close that gap.

46. Second, the government litigates this subject through sealed, *ex parte* submissions the affected individuals never see. See, e.g., *IALDF*, ECF Nos. 48, 50. Against a record they are not permitted to read, the evidence Plaintiffs can offer is their own testimony about what was done to them. Plaintiffs plead the facts within their personal knowledge accordingly, and the just resolution of this action will require an evidentiary hearing at which they may be heard.

**E. The Stated Rationale Cannot Coexist With the Conduct**

47. Set the government's words beside its acts. It certified that Plaintiffs' presence harms American foreign policy - then blocked their departure five times and appealed the order permitting it. It branded the family a "clear threat" to national security[4] in a press statement - but charged no security ground, only the foreign-policy provision, and alleged no conduct. It publicly announced the family's green cards were "revoked" - and then, in September 2026, its own benefits agency renewed Ms. Tahmasebi's permanent resident card and mailed it to her in detention. It told the press the sharing allegations are false - while its courtroom counsel professed ignorance and its own emails documented the channel. A rationale that must change costume for each audience is not a rationale. It is a cover story. *Dep't of Commerce*, 588 U.S. 752.

48. The President's own words now supply the measure. On November 8, 2026, in an interview broadcast on CBS's 60 Minutes, the President was asked whether his deportation policy "went too far." He answered: "I think it might be too tough." He acknowledged that "we also took people that had good jobs," whose only "violation" was the manner of their entry, and proposed to "let the people that are here, and, in some cases, here for 10 and 15 years, work a deal for them" - while defending the removal of "the bad ones." Interview with President Donald J. Trump, 60 Minutes (CBS television broadcast Nov. 8, 2026). Plaintiffs are the people the President described: residents of more than a decade, employed, law-abiding, raising a son who has grown up in American schools - except that Plaintiffs committed no entry violation at all. Each was inspected and admitted on a visa; each became a lawful permanent resident. By the Executive's own public account, enforcement

[4] Of note: the removal ground charged is the now-infamous "foreign policy" ground, and it actually distinguishes between national security-related grounds and foreign policy-related grounds. The two are not the same and are not coterminous. However, in the press (and in many judicial proceedings) the two are conflated. This Court should be aware that this case is foreign policy-based, not national security based, despite what Rubio might tweet.

against such people "might be too tough." Yet as to this family, Defendants will neither release them, nor let the mother's and son's appeals proceed from liberty, nor permit the father to depart under the voluntary-departure order he won. Conduct that the administration's stated enforcement philosophy disclaims, and that no removal purpose explains, is explicable by what the record above documents: an undisclosed arrangement whose subjects are selected by a foreign government reviewing Defendants' records.

**F. The Injuries**

49. Plaintiffs' records sit in the very systems that feed a documented disclosure channel to the government they fear, operated by the agencies that detain them, which refuse to say whether Plaintiffs' records have already moved through it. Ms. Tahmasebi's exercise of her statutory right to present her protection claims was demonstrably chilled - on a transcript - by that refusal. Plaintiffs' relatives in Iran face exposure. Plaintiffs have suffered pecuniary harm, including salary and teaching income lost and withheld during Ms. Tahmasebi's detention; continuing rent and household obligations for a home they cannot occupy; and out-of-pocket communications, commissary, and mitigation expenses incurred because of their detention and the disclosure risk. Each has suffered an adverse effect within the meaning of 5 U.S.C. § 552a(g)(1)(D).

50. Each Plaintiff has also suffered injuries that exist nowhere on paper and that only each Plaintiff can prove. Ms. Tahmasebi lives with the knowledge that the government holding her will not say whether her file - including the protection claims she presented in confidence - is already in Tehran's hands, and with fear for her relatives in Iran whom any such disclosure exposes; she has watched her husband deteriorate across seven months of

separation, a decline she has described to counsel as watching him grow old in front of her eyes.

51. Mr. Hashemi has spent these seven months in a segregated adult facility, 15 minutes and a world apart from his wife and son, under a detention the government's own written counteroffer treated as a bargaining term rather than an incident of process; the psychological toll of that separation and that knowledge is his alone to describe. S.M.H. has spent what should have been a school year inside a detention center, watching his parents' fear, knowing a foreign government he barely knows may hold his name and records, based only on who his grandmother was. The nature, severity, and causes of these injuries - the actual damages 5 U.S.C. § 552a(g)(4) makes compensable - are facts within Plaintiffs' exclusive personal knowledge, provable only through their own testimony.

52. The central facts of this action are, moreover, squarely and irreconcilably disputed. The government has declared the core factual allegation - the sharing of detainee records with Iran - "FALSE." Plaintiffs allege, on documents and on personal knowledge, that it is true. Both cannot be right, and the difference between them is not a question of law: it is a question of fact, of the kind the related case demonstrates is resolved in this District through live testimony and credibility findings. Plaintiffs are the witnesses to much of what they allege: the circumstances of their arrests on April 9 and 10, 2026; what was communicated to them in detention, including the government's written proposal of stipulated removal with continued detention; the proceedings they attended and testimony they gave; and the injuries described above. No document can substitute for their account, and no government declarant can contradict it from personal knowledge.

53. Finally, Plaintiffs' ability to place that testimony before this Court rests entirely in Defendants' hands: the defendants in this action are the custodians of the plaintiffs who bring it. Plaintiffs are civil detainees, held under an authority that is by definition non-punitive; none has any criminal history; and their custody therefore supplies no penological or security consideration that could weigh against their appearance. At the October 15, 2026 hearing in the related case, the government's account came in live, through two officials the court heard and credited, while the detainees' accounts arrived on paper, through declarations of individuals who were not parties and whom no party could produce. Plaintiffs here are parties. This is the first proceeding arising from this program in which the individuals with personal knowledge on both sides can be heard the same way - in open court, under oath, subject to cross-examination - and the complaint is pleaded so that they may be.

**NO PUBLISHED ROUTINE USE AUTHORIZES THESE DISCLOSURES**

54. The Privacy Act's "routine use" exception, 5 U.S.C. § 552a(b)(3), permits only disclosures described in a System of Records Notice published in the Federal Register, and only for uses "compatible with the purpose for which [the record] was collected." Id. § 552a(a)(7). The records at issue here - Plaintiffs' biographic data, immigration and detention histories, family-unit identifiers, and travel documents - are maintained in, at minimum, DHS/ICE-011, Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 Fed. Reg. 55,638 (July 5, 2024), and the Alien File system of records. No routine use published for any of these systems covers what Defendants did.

55. The government will point to CARIER Routine Use N, which permits disclosure "[t]o foreign governments for the purpose of coordinating and conducting the removal of non-

citizens from the United States to other nations under the Immigration and Nationality Act; and to international, foreign, intergovernmental, and multinational agencies, authorities, and organizations in accordance with law and formal or informal international arrangements." Neither clause covers these disclosures. The first fails three times over.

56. First, by its terms, Routine Use N authorizes disclosure for one purpose: "coordinating and conducting the removal" of a noncitizen "under the Immigration and Nationality Act." No Plaintiff is subject to an administratively final order of removal. There is no removal to coordinate and none to conduct. A disclosure made while proceedings are pending - while the individual retains lawful permanent resident status and undecided protection claims on appeal - is not made for the purpose Routine Use N describes, because that purpose does not yet exist. And nothing in the Immigration and Nationality Act makes the receiving state a participant in selecting who is removed. A channel through which the Islamic Republic of Iran reviews manifests, "request[s]" amendments, and nominates detainees for flights is not the coordination of removals "under the" INA. It is a practice no statute describes and no routine use reaches.

57. Second, a routine use cannot authorize what the Department's own regulations forbid. 8 C.F.R. §§ 208.6, 1208.6, 236.1(e). DHS itself reads its routine uses as subordinate to those regulations: its Asylum Information and Pre-Screening SORN states that "[e]ven when a valid routine use permits the disclosure of information from this system of records to a third party . . . such disclosure may not be permissible because of confidentiality laws and policies that limit the sharing of information regarding individuals applying for asylum," and conditions its individual routine uses "as limited by the terms and conditions of 8 CFR 208.6." DHS/USCIS-010, 80 Fed. Reg. 74,781 (Nov. 30, 2015). The Department cannot

maintain that hierarchy where it protects the government's files and abandon it where it protects the applicant.

58. Third, compatibility is a ceiling no routine use may pierce. An agency "may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act," and a published routine use is invalid to the extent it authorizes an incompatible disclosure. *Doe v. Stephens*, 851 F.2d at 1465-66; 5 U.S.C. § 552a(a)(7). These records were collected to adjudicate Plaintiffs' immigration status and protection claims and to administer their custody. Delivering them to the government from which Plaintiffs seek protection is not an incompatible use in degree. It is the collected purpose's antithesis. If Routine Use N were construed to permit it, Routine Use N would be invalid to that extent.

59. Nor does Routine Use N's second clause reach further. Whatever an "informal international arrangement" may be, disclosure under it is authorized only "in accordance with law" - and the law includes the Department's own confidentiality regulations, 8 C.F.R. §§ 208.6, 1208.6, 236.1(e), and the Act's compatibility ceiling, 5 U.S.C. § 552a(a)(7). A clause construed to permit the undisclosed delivery of a protection-seeker's records to the government he seeks protection from, under an arrangement too informal to be written down, would be invalid for the same three reasons. An agency cannot publish a routine use for lawful coordination and perform through it what no law allows.

60. No other published routine use comes closer - and the burden of bringing a disclosure within an exception to § 552a(b)'s prohibition rests in all events on Defendants, who have refused to identify any. Routine Use J permits disclosure to foreign agencies "during a proceeding within the purview of immigration and nationality laws" only when "necessary to carry out [DHS's] functions and statutory mandates"; no statute makes it a DHS function

to furnish a foreign adversary the records of detainees with pending protection claims, and a routine use read that broadly would swallow the Act and fail the compatibility ceiling. Routine Use R concerns the Department of State's processing of benefits and information requests, not delivery of detainee dossiers to an adversary government. Routine Uses G, T, and XX reach cooperation with foreign "law enforcement" agencies - the Islamic Republic of Iran is investigating no violation of law cognizable here, Routine Use XX additionally requires a memorandum of agreement Defendants have never identified, and persecution is not an official duty. Routine Uses K and L permit intelligence liaison with "selected foreign governments" - a description Defendants cannot soberly apply to a designated state sponsor of terrorism receiving dossiers on its own dissidents' families. Routine Use SS permits notifying a foreign government that its citizen is incapacitated, an unaccompanied minor, or deceased; Plaintiffs are none of these. And Routine Use YY reaches assistance to agencies aiding "non-citizens who are returning voluntarily to their home countries" - a description these facts invert: Plaintiffs volunteered to return, and Defendants refused, reserving disclosure for the involuntary channel Tehran supervises. The statutory law-enforcement exception fails at the same threshold: § 552a(b)(7) is limited to instrumentalities "within or under the control of the United States."

61. Nor do the exemptions DHS has claimed for CARIER assist Defendants. The Department has exempted that system, under 5 U.S.C. § 552a(j)(2) and (k)(2), from provisions including the accounting-access and record-access provisions, §§ 552a(c)(3), (d). But Congress placed subsection (b)'s disclosure prohibition, subsection (c)(1)'s duty to maintain the accounting, and subsection (e)(10)'s safeguards duty beyond the reach of any exemption. 5 U.S.C. § 552a(j), (k). No exemption makes an unlawful disclosure lawful, and

no exemption excuses an agency from knowing - and recording - what it disclosed, to whom, and why.

**COUNT I**

**Privacy Act - Unlawful Disclosure**
5 U.S.C. § 552a(b), (g)(1)(D), (g)(4) - Against the Agency Defendants

62. Plaintiffs incorporate the foregoing paragraphs.

63. Plaintiffs are "individuals." Their A-file materials, biographic data, identity-document scans, detention records, and protection-related information are "records" in "systems of records." 5 U.S.C. § 552a(a)(2), (a)(4)-(5).

64. On information and belief, the agency Defendants disclosed records pertaining to Plaintiffs to representatives of the Islamic Republic of Iran, the State of Qatar, or other intermediaries, without Plaintiffs' written consent. That belief rests on specific facts: the documented program directing removal of "all removable FO Iranians in custody"; the documented channel transmitting manifests and identity documents for Iranian-Embassy approval; sworn and pleaded accounts of hand-delivered rosters, dossiers, and files, and of Interests Section access to detainees inside ICE facilities; Plaintiffs' detention within the program's operational hub; the Secretary's personal designation of this family; and the government's refusal - three times on the record, and once in its own words, "I don't know if any communication was communicated to anyone" - to deny that Plaintiffs' records have moved. The facts that would confirm or refute the disclosures are exclusively in Defendants' possession, and Defendants refuse to produce them.

65. No § 552a(b) exception applies, for the reasons set out above.

66. The violations were intentional or willful - committed without grounds for believing the conduct lawful, or in flagrant disregard of Plaintiffs' rights. Defendants acted against their

own confidentiality regulations, 8 C.F.R. §§ 208.6, 236.1(e); against ICE's own November 30, 2022 public statement acknowledging that improper disclosure of noncitizens' personally identifiable information endangers them; under a leadership directive; on an accelerated basis when federal litigation loomed; and behind categorical public denials their own courtroom counsel would not repeat. Each disclosure had an adverse effect on Plaintiffs and caused actual damages. Plaintiffs are each entitled to actual damages of not less than $1,000 per violation, costs, and attorney's fees. 5 U.S.C. § 552a(g)(4).

## COUNT II

**Privacy Act - Failure to Maintain, Safeguard, and Produce the Accounting of Disclosures**
5 U.S.C. § 552a(c), (e)(10), (g)(1)(D); in the alternative, 5 U.S.C. § 706 - Against the Agency Defendants

67. Plaintiffs incorporate the foregoing paragraphs.

68. Subsection (c)(1)'s duty to keep an accurate accounting of every disclosure, and subsection (e)(10)'s duty to safeguard the security and confidentiality of records, are absolute: Congress placed them beyond the reach of every exemption an agency can promulgate. 5 U.S.C. § 552a(j), (k). Either Defendants kept the accountings the statute commands - in which case they can produce them and answer in one page the question they have dodged in three forums - or they did not, in which case the recordkeeping violation is itself intentional or willful and compounds Count I.

69. On November 9, 2026, immediately before this filing, Plaintiffs served requests for their accountings under § 552a(c)(3) and for their records under § 552a(d)(1) on each agency Defendant. To the extent any Defendant invokes a promulgated exemption against the access provisions, the exemption cannot excuse the underlying (c)(1) and (e)(10) duties, cannot apply to disclosures outside any exempted purpose, and cannot be applied to conceal unlawful disclosures without abusing the exemption's terms. Plaintiffs will

supplement this count upon the agencies' responses or their failure to respond within the time their regulations allow. In the alternative, any refusal to produce the accountings is agency action unlawfully withheld and not in accordance with law, reviewable under 5 U.S.C. § 706.

70. Defendants' failures have had, and are having, an adverse effect on Plaintiffs: they cannot learn who holds their information, cannot assess or mitigate the danger to themselves and their relatives, and could not fairly litigate protection claims that turn on what Defendants disclosed.

**COUNT III**

**APA - The Iran Disclosure-and-Coordination Program Is Unlawful**
5 U.S.C. §§ 705, 706(2)(A), (B), (C), (D) - Against All Defendants

71. Plaintiffs incorporate the foregoing paragraphs.

72. The program described above is final agency action: it was adopted by a discrete bilateral arrangement in March 2025 and a discrete directive on June 19, 2025; it marked the consummation of the agencies' decisionmaking on the removal of Iranian nationals as a class; and legal consequences, including the transmission of protected information, flow from it. Plaintiffs challenge the program itself - its adoption and its identified implementing transmissions - not any step in their removal proceedings.

73. The program is not in accordance with law and exceeds statutory authority. It effects disclosures that 5 U.S.C. § 552a(b) forbids and that 8 C.F.R. §§ 208.6 and 236.1(e) independently forbid, through a channel whose defining feature - person-by-person approval by the Islamic Republic of Iran, informed by American detention records - has no statutory basis. Exercising the independent judgment the APA requires, *Loper Bright*, 603 U.S. 369, no provision of the INA authorizes an agency to hand a detainee's identity

documents to the government he fears or to cede control of American removal manifests to a foreign adversary. That is not a gap for agency discretion to fill. It is a line Congress drew in 1974 and the agencies crossed by email.

74. The program is arbitrary and capricious for an independent reason: its rationale is not genuine. The program's stated purpose - and the stated purpose of the determinations that feed Plaintiffs into it - is to protect American foreign policy by ending the presence of individuals whose presence harms it. In operation, the program prolongs that presence: it blocks self-funded departure, appeals voluntary-departure grants, and detains its subjects for months, while empowering the foreign adversary at issue to select and schedule the passengers. No rational connection exists between the facts found and the choices made, and the mismatch between word and deed establishes that the proffered justification is contrived. *Dep't of Commerce*, 588 U.S. 752. On that showing, Plaintiffs are entitled to extra-record discovery into the program's genuine purposes. Id.; *Overton Park*, 401 U.S. 402.

75. The program is also contrary to constitutional right, 5 U.S.C. § 706(2)(B), for the reasons stated in Counts IV and VI.

76. Plaintiffs will move under 5 U.S.C. § 705 to stay the program's operation as to them pending review. A stay suspends the challenged action; it commands no one, enjoins no removal, and touches no custody determination.

## COUNT IV

**Fifth Amendment - Punishment of Kinship Without Personal Guilt;**
**First Amendment - Retaliation for Petitioning, in the Alternative**
U.S. Const. amends. I, V; 5 U.S.C. § 706(2)(B) - Against All Defendants

77. Plaintiffs incorporate the foregoing paragraphs.

78. The Constitution does not permit the government to impose punishment on the basis of kinship alone. "In our jurisprudence guilt is personal," and punishment resting on one's relationship to another's supposed wrongdoing requires a relationship "sufficiently substantial to satisfy the concept of personal guilt." *Scales v. United States*, 367 U.S. 203 (1961). Deportation "is a penalty - at times a most serious one," demanding "meticulous care." *Bridges v. Wixon*, 326 U.S. 135 (1945); *see* id. (Murphy, J., concurring) (condemning "guilt by association or imputation"). The Constitution's own text marks how far the principle runs: even attainder of treason "shall not work Corruption of Blood" - family punishment is forbidden at the maximum. U.S. Const. art. III, § 3, cl. 2. Here there is no membership, no affiliation, no act, no belief alleged - only blood. The government has not failed to satisfy the concept of personal guilt. It has not even attempted to.

79. The punishment is not a metaphor. Under the Due Process Clause, a detainee "may not be punished prior to an adjudication of guilt," and a restriction amounts to punishment where officials express an intent to punish, or where no alternative purpose rationally explains it. *Bell v. Wolfish*, 441 U.S. 520 (1979). Both routes are satisfied. The intent is expressed: a written demand for removal "with continued detention," and an appeal whose sole operative effect is to prolong custody. And no alternative purpose exists: detention cannot serve removal when the detainee's removal - at his own expense, on his own valid passport - is the very thing the government is blocking. *Wong Wing*, 163 U.S. 228. The burdens imposed on Plaintiffs are punitive in purpose as well as in effect, and punishment on this record was imposed without any adjudication of personal guilt at all.

80. In the alternative, and independently, Defendants' conduct retaliates against protected petitioning. Plaintiffs invoked the protections of American law: asylum applications, a

federal habeas petition, subpoena applications, this Court's sister docket. Defendants' documented response to legal process is acceleration and obstruction - "Given the federal habeas petition, we appreciate your quick assistance on this case!" (FOIA Rel. at 0500) - and, as to Ms. Tahmasebi, the strategic refusal to certify non-disclosure, which predictably and successfully chilled her testimony in her own asylum case. A sister court has already found, on a full trial record, that these same cabinet officers implemented removal policy "intentionally and in concert" against protected expression. *AAUP v. Rubio*, No. 1:25-cv-10685-WGY (D. Mass.) (findings of Sept. 30, 2025; opinions of Jan. 22 and Mar. 11, 2026). The pattern pleaded here is of a piece.

**COUNT V**

**Violation of the *Accardi* Doctrine - Failure to Follow the Government's Own Binding Confidentiality Rules**

U.S. Const. amend. V; 5 U.S.C. § 706 - Against All Defendants

81. Plaintiffs incorporate the foregoing paragraphs.

82. Administrative agencies are bound to follow their own rules. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The doctrine reaches "even self-imposed procedural rules that limit otherwise discretionary decisions," *Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018) (quoting *Wilkinson v. Legal Servs. Corp*., 27 F. Supp. 2d 32, 34 n.3 (D.D.C. 1998)); it "is premised on fundamental notions of fair play underlying the concept of due process," *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991); and a claim for its violation may proceed whether framed under the Due Process Clause, the APA, or as a distinct cause of action. Jefferson, 285 F. Supp. 3d at 185-86.

83. The confidentiality protections of 8 C.F.R. §§ 208.6, 1208.6, and 236.1(e) - and ICE's own stated policy, announced publicly on November 30, 2022, of protecting noncitizens' personally identifiable information from improper disclosure - are precisely such

safeguards: they are the only protection an applicant has against the agency delivering the fact and content of her protection claims to the government she fled. Defendants are bound by them.

84. Defendants' conduct - transmitting manifests and identity documents into a channel supervised by the Islamic Republic of Iran, facilitating Interests Section access to detained protection-seekers, refusing to certify or account for what has been shared - flagrantly violates those binding protections, places Plaintiffs in peril wherever they go, and jeopardizes their relatives. The violations deprive Plaintiffs of the procedural fairness the Accardi doctrine guarantees, independently of the APA.

## COUNT VI

### Fifth Amendment - State-Created Danger and Custodial Endangerment

U.S. Const. amend. V; 5 U.S.C. § 706(2)(B) - Against All Defendants

85. Plaintiffs incorporate the foregoing paragraphs.

86. Under the State-endangerment doctrine, "an individual can assert a substantive due process right to protection . . . from third-party violence when [government] officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." *Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) (en banc). Where the government releases personal information in circumstances that substantially increase a person's vulnerability to "private acts of vengeance" by a recipient with a demonstrated propensity for violence, it creates a constitutionally cognizable "special danger" - danger aimed at that person specifically - and the disclosure itself triggers the most exacting scrutiny. *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998). Government officials who hand the subject of a tip the informant's identifying material - over his pleas - are liable when the predictable violence follows. *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1999).

87. Defendants did not stand by while danger found Plaintiffs. They created it, twice over, while holding Plaintiffs immobile. First, they transmitted Iranian detainees' identifying information - manifests, passport and travel-document scans, dossiers, files - into a channel reviewed and supervised by the Islamic Republic of Iran, a government whose practices of unlawful killing, torture, and arbitrary detention Defendants' own country reports and presidential findings describe. Defendants knew what that means: in their own litigation, Defendants swear that public disclosure of a person's identity as a United States source abroad brings consequences "from economic reprisals to possible harassment, imprisonment, or even death," and ICE's own November 30, 2022 statement acknowledges that improper disclosure of noncitizens' personally identifiable information endangers them. Second, Defendants themselves broadcast the family's identities: the Secretary of State published their case to the world over Mr. Hashemi's photograph, and accompanying government statements named all three Plaintiffs - including a sixteen-year-old child - together with their immigration status.

88. The danger is individualized, present, and continuing. It is aimed at these Plaintiffs by name - a designation, a public post, and a dossier are the opposite of a generalized risk. It exists now: Plaintiffs' relatives in Iran are exposed now; Interests Section officials have received access to Iranian detainees inside the very facilities where Plaintiffs are held; and the removal pipeline operates now. And it does not expire at the facility gate: information delivered to the Islamic Republic of Iran, or published to the world, cannot be recalled. The constitutional wrong is complete at the moment of disclosure, and the duty it creates follows the danger - not the custody.

89. Custody aggravates the violation. Having restrained Plaintiffs' every means of self-protection - they cannot relocate, conceal themselves, or shield their child from the publicity Defendants created - Defendants owed them protection, not exposure. "The affirmative duty to protect arises . . . from the limitation which [the state] has imposed on his freedom to act on his own behalf." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989). Defendants are the jailer and the megaphone at once.

90. Defendants' conduct shocks the conscience: it was deliberate, directed, sustained over months, undertaken against their own regulations and public statements, and - as Defendants' written demand for "continued detention" and their documented acceleration in response to federal litigation show - purposeful. Plaintiffs are entitled to declaratory relief and to an order requiring notice to Plaintiffs before any release of their identifying or protection-related information, so that they may invoke their rights before the next disclosure rather than after it. *Kallstrom*, 136 F.3d 1055 (due process requires pre-release notice where disclosure threatens personal security).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that Defendants' disclosure of Plaintiffs' records and protection-related information to representatives of the Islamic Republic of Iran, directly or through intermediaries, violates 5 U.S.C. § 552a(b) and 8 C.F.R. §§ 208.6 and 236.1(e);
2. Vacate the Iran disclosure-and-coordination program as to Plaintiffs, and stay its operation as to Plaintiffs under 5 U.S.C. § 705 pending review;
3. Enjoin Defendants, under the APA and the Constitution, from disclosing Plaintiffs' identifying or protection-related information to any official, employee, or

representative of the Islamic Republic of Iran, or to the government of any third country in connection with any removal or transfer, directly or through any intermediary, and from including any Plaintiff's name, records, or identity documents in any manifest, dossier, list, or travel-document request transmitted to any such person;

4. Order that Defendants provide Plaintiffs advance written notice before any release of their identifying or protection-related information to any third party, so that Plaintiffs may assert their rights before disclosure;
5. Order Defendants to preserve all records of communications with representatives of the Islamic Republic of Iran, the State of Qatar, or any intermediary concerning Iranian nationals in ICE custody, including all records concerning Plaintiffs;
6. Order Defendants to produce to each Plaintiff, within fourteen days, the accounting of disclosures required by 5 U.S.C. § 552a(c);
7. Award each Plaintiff actual damages of not less than $1,000 per willful violation under 5 U.S.C. § 552a(g)(4), together with costs and reasonable attorney's fees under § 552a(g) and 28 U.S.C. § 2412;
8. Grant leave, upon Plaintiffs' motion and the showing made herein, for expedited and extra-record discovery;
9. Set this action for an in-person evidentiary hearing upon Plaintiffs' motion for preliminary relief, and thereafter for trial, at the earliest practicable date; and
10. Grant such other relief as is just - expressly excluding any order respecting custody, the conduct of removal proceedings, or the execution of any order of removal. Nothing in this action impedes, and no relief sought would impede, Plaintiffs' own prompt departure from the United States, which requires no disclosure to anyone.

Dated: November 10, 2026

Respectfully submitted,

/s/ Hassan M. Ahmad
Hassan M. Ahmad, Esq.
(D.D.C. Bar No. MD16049)
The HMA Law Firm, PLLC
6 Pidgeon Hill Dr., Suite 330, Sterling, VA 20165
703.964.0245 | hma@hmalegal.com

/s/Curtis Lee Morrison
Curtis Lee Morrison, Esq.
(D.D.C. Bar No. 1631896)
Red Eagle Law, L.C.
5256 S. Mission Rd., Suite 135, Bonsall, CA 92003
714.661.3446 | curtis@redeaglelaw.com

Counsel for Plaintiffs